

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JAN 2 9 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| SANDRA DOE | § | |
| | § | CIVIL ACTION NO. |
| VS. | § | |
| | § | B - 00 - 182 |
| EDWARD A. VALENT | § | |

## MOTION FOR PROTECTIVE ORDER

TO THE HONORABLE U.S. DISTRICT COURT:

COMES NOW **SANDRA DOE**, Plaintiff in the above styled and numbered action, and files this her Motion for Protective Order, requesting permission to proceed in this action under a fictitious name, and for such motion would respectfully show unto the Court the following:

### I.

### SUMMARY AND BACKGROUND

1.     Plaintiff SANDRA DOE filed this action against Defendant Edward Valent, complaining of actions taken by Defendant Valent violating her right to privacy, including his making of suggestive sexual remarks and advances, as well as acts of sexual assault.   The actions complained of by Ms. Doe included acts that would constitute Sexual Assault, in violation of Texas Penal Code §22.011, including oral and vaginal penetration without her consent.   The facts of what occurred to Plaintiff Doe were of an utmost private nature, offensive, and extremely embarrassing.

V:\FP\MOTIONS\196-00.PO                                                    PAGE 1

2.      Although the Fifth Circuit follows a presumption of necessary disclosure of each party's name, this Court retains discretion to accommodate Plaintiff's need to proceed anonymously through the use of a fictitious name where concerns of privacy justify some degree of anonymity.  Because Plaintiff has agreed to disclose her identity to Defendant, and Defendant will be not hampered in his investigation or defense of Plaintiff's claims, Defendant cannot identify any prejudice he would suffer in allowing Plaintiff to remain anonymous in the pleadings of this action, and the Court should therefore allow Plaintiff to proceed anonymously to the limited extent of any documentation filed with, and matters involving, this Court.  Plaintiff does agree to submit to the Court a sealed affidavit identifying herself as Sandra Doe.

## II.

## ARGUMENT AND AUTHORITIES

3.      The Fifth Circuit first discussed a Plaintiff's request to proceed anonymously in a civil case in *Southern Methodist University Association of Women Law Students v. Wynne & Jaffe.*  599 F.2d 707 (5th Cir. 1979).  In *Southern Methodist University Association*, a number of female lawyers sought to proceed anonymously, alleging that two (2) Dallas law firms had discriminated against women in hiring summer law clerks and associates.  Id.  The women alleged they were fearful that if they identified themselves, they would be thereafter singled out for discrimination by the Defendants and other law firms.  *Id*. at 710-11.  The Court explained that Federal Rule of Civil Procedure 10(a) and Title VII do not provide any exception to the general principal that a party's identity should not be concealed.  The Court added, however, that "'where the issues involved are matters of a sensitive and highly personal nature,' such as birth control,...abortion,...homosexuality...or the welfare rights of illegitimate children or

abandoned families,...the normal practice of disclosing the parties' identities yields 'to a policy of protecting privacy in a very private matter.'" *Id.* at 712-13 (citations omitted). The Court's explanation for allowing Plaintiffs to use fictitious names in those cases was because those Plaintiffs had to divulge "personal information of the utmost intimacy," although the Plaintiffs in *Southern Methodist University Association* did not need to "reveal facts of a highly personal nature...." *Id.* at 713. Finding "neither and express congressional grant of the right to proceed anonymously nor a compelling need to 'protect...privacy in a very private matter'" the Court denied the Plaintiffs in *Southern Methodist University Association* the right to sue under fictitious names. *Id.*

4.    Thereafter, the Court considered *Doe v. Stegall*, a case in which a mother and her two children sought to proceed under fictitious names in a suit challenging the constitutionality of prayer and bible reading exercises in Mississippi public schools. 653 F.2d 180 (5th Cir. 1981). As in *Southern Methodist University Association*, the Court again considered the general principal in Rule 10(a) requiring disclosure of parties' names, before discussing the principle that a party may need to proceed anonymously because of very private facts that may be disclosed. *Id.* at 185. The Court then identified its task as determining under what circumstances "the normal practice of disclosing parties' identities yields 'to a policy of protecting privacy in a very private matter.'" *Id.*, *quoting Southern Methodist University Association*, 599 F.2d at 713; *Doe v. Deschamps*, 64 F.R.D. 652, 653 (D. Mont. 1974). The Court further explained that although *Southern Methodist University Association* identified three factors a court should consider in determining whether privacy concerns should override a presumption of openness of judicial proceedings, the Court concluded that it would "advance no

hard and fast formula for ascertaining whether a party may sue anonymously." *Doe v. Stegall*, 653 F.2d at 186. The three factors identified in *Southern Methodist University Association* were as follows:

> (1)    Plaintiffs seeking anonymity were suing to challenge governmental activity;
>
> (2)    Prosecution of the suit compelled Plaintiffs to disclose information "of the utmost intimacy;" and,
>
> (3)    Plaintiffs were compelled to admit their intention to engage in illegal conduct, thereby risking criminal prosecution.

*Id*. at 185. Although the Stegall Court found only the first factor was present in that case, it nonetheless concluded that anonymity was proper. *Id*. at 185-86. An additional factor militating in favor of the privacy rights of the Plaintiffs was the fact that some of the Plaintiffs were children. *Id*. at 186.

    5.    As in *Stegall*, the facts in the present action involve extremely private matters. As in *Southern Methodist University Association*, facts relating to the sexual assault of Plaintiff Sandra Doe involves "matters of a sensitive and highly personal nature," at least as sensitive and personal as "birth control, abortion, [and] homosexuality...." *Southern Methodist University Association*, 599 F.2d at 712-13.

    6.    Plaintiff does not seek to avoid disclosing her identity to Defendant altogether, nor does she seek to restrict Defendant's ability to disclose her identity during the discovery process. Rather, Plaintiff seeks only to restrict the use of her name during any proceedings before this Court. Plaintiff does not seek to restrict Defendant's ability to conduct discovery and whatever investigation he feels appropriate. As a result, Defendant will not be prejudiced in any

manner if this Court should grant Plaintiff's Motion.  Plaintiff seeks only to limit the public disclosure of her name and identity that would be available to the public through the filing or proceedings with any matter before this Court.  Such an order would protect the interests of both Plaintiff and Defendant herein, and would prejudice neither.

7.      As Defendant has agreed, "when the issues involved are those of a highly personal or sensitive nature, the scale tips in favor of an individual's privacy rather than the public's interest in open judicial proceedings." *See* Defendant Edward Valent's Memorandum in Support of Defendant Edward Valent's Motion to Dismiss Regarding Subject Matter Jurisdiction and Other Matters, pp.10-11, and cases cited, including *Roe v. Wade*, 410 U.S. 113 (1973), *et al*. In particular, if the facts of transexuality are sufficiently personal to merit authorization of the use of a fictitious name, the facts of a sexual assault should certainly be sufficiently personal to justify such anonymity. *See Doe v. McConn*, 489 F.Supp. 76 (S.D. Tex. 1980).  A description of the facts involved in the sexual assault of Ms. Doe, setting out the highly personal nature of the facts, and the need for anonymity, is attached hereto as Exhibit "A."

8.      One commentator has suggested the following rule for allowing Plaintiffs to proceed anonymously:

> First, a Court must determine whether the Plaintiff has established a prima facie case that Doe-plaintiff status in his particular circumstances effectively furthers the procedure's policies.  Then, the Court should determine whether this prima facie case is rebutted because the procedure presents insurmountable problems to the Defendant.  If procedural compromises will enable the Defendant to overcome those problems while enabling the Plaintiff to maintain anonymity, then no disqualification should occur.  If the harm to the Defendant cannot be overcome, the Court should require disclosure.

*William S. Kleinman*, Note, *Who is Suing You?: John Doe Plaintiffs in the Federal Courts*, 61 TEX.L.REV. 547, 561 (1982), a copy of which is attached hereto as Exhibit "B." Mr. Kleinman's Note also provides a thorough analysis of circumstances under which Plaintiffs have been allowed to proceed anonymously, including a discussion of the *Southern Methodist University Association* and *Stegall* cases.

WHEREFORE, PREMISES CONSIDERED, Plaintiff **SANDRA DOE** would respectfully request that upon consideration of this Motion that she be allowed to proceed anonymously in all pleadings and matters before this Court, and that she be granted such other and further relief to which she may show herself to be justly entitled, whether general or special, at law and in equity.

Signed on this the 29th day of January, 2001.

Respectfully submitted,

**LAW OFFICE**
**J. ARNOLD AGUILAR**
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520
Telephone  :  (956) 504-1100
Facsimile  :  (956) 504-1408

By: _____
J. Arnold Aguilar
State Bar No. 00936270
Federal Adm. No. 6822

Attorney for Plaintiff,
SANDRA DOE

## CERTIFICATE OF CONFERENCE

I, J. Arnold Aguilar, hereby certify that I conferred with Defendant's counsel, David Horton, who advised me that he is opposed to my filing this motion.

_____
J. Arnold Aguilar

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing **PLAINTIFF'S MOTION FOR PROTECTIVE ORDER** has on this the 29th day of January, 2001, been forwarded via certified mail, return receipt requested to:

Mr. David Horton
NEEL & HORTON, L.L.P.
P.O. Box 2159
South Padre Island, TX 78597

Mr. Paul Hemphill
Attorney at Law
815 Ridgewood
Brownsville, TX 78520

Ms. RosaMaria Villagomez
Mr. Ray A. Cowley
RODRIGUEZ, COLVIN & CHANEY
P. O. Box 2155
Brownsville, TX 78522

_____
J. Arnold Aguilar

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SANDRA DOE | § | |
| | § | CIVIL ACTION NO. |
| VS. | § | |
| | § | B - 00 - 182 |
| EDWARD A. VALENT | § | |

## ORDER SETTING HEARING

On this _____ day of _____, 2001, came on to be considered *Plaintiff's Motion for Protective Order* in the above styled and numbered cause.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Protective Order be and is hereby set for hearing on the _____ day of _____, 2001, at _____ o'clock _____.m.

SIGNED FOR ENTRY this _____ day of _____, 2001.

_____
John Wm. Black,
U. S. Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SANDRA DOE | § | |
| | § | CIVIL ACTION NO. |
| VS. | § | |
| | § | B - 00 - 182 |
| EDWARD A. VALENT | § | |

## ORDER

On the _____ day of _____, 2001, this cause came for hearing

on *Plaintiff's Motion for Protective Order.*

After hearing the argument of counsel thereon, the Court is of the opinion that Plaintiff's

Motion for Protective Order should be GRANTED;

IT IS THEREFORE ORDERED, ADJUDGED and DECREED that Plaintiff's Motion

for Protective Order is GRANTED and all pleadings, documents, hearings and other matters

before this Court referring to Plaintiff shall identify her as Sandra Doe.  All matters occurring

outside of the Court and documents filed herein, however, may reference Plaintiff by her actual

name.

SIGNED on this the _____ day of _____, 2001.


_____
John Wm. Black,
U.S. Magistrate Judge

# EXHIBIT "A"

CibPDF - www.fastio.com

On or about August 1988, Sandra Doe was first employed by Respondent as a Spanish teacher with BISD at their Pace High School campus. Brownsville Independent School District maintains a site-based management system, and it had previously assigned Mr. Eddie Valent as its Principal at, and ultimate authority for, the Pace High School campus. Ms. Doe initially worked under the supervision of Mr. Valent for three (3) years. In October of her second year at Pace, Ms. Doe was involved in an auto accident, which resulted in her suffering from seizures, and ultimately resulted in brain surgery in San Antonio, Texas. As a result of this auto accident, Ms. Doe was left with a diminished mental capacity, and an inability to fully understand or appraise the nature of improper conduct. After taking a year off following the birth of her son, she returned to work for BISD, and she was transferred to Rivera High School for a year. The following year, she was transferred to Lincoln Park Middle School, where she taught for another year. She was then transferred to Central Middle School as an Attendance Monitor, where she was again under the supervision of Principal Eddie Valent, who had previously been transferred to Central Middle School. While at Central Middle School, Ms. Doe allowed herself to become somewhat friendly with Mr. Valent. She had just gotten married and Mr. Valent was in the process of getting separated or divorced. During that time, Mr. Valent would ask her to walk with him or have lunch with him, as a friend, which Ms. Doe agreed to do on a very professional and platonic level. The following year, Ms. Doe was transferred to Perkins Middle School, where she taught for three (3) years as a Spanish teacher and a teacher's aide. She was then transferred back to Rivera High School, as a permanent substitute teacher, where she stayed for another year. At the beginning of the 1999-2000 school year, Ms. Doe was transferred to the Alternative Center, where she was again under the supervision of Eddie Valent.

When Ms. Doe was first assigned to the Alternative Center, Mr. Valent told her he did not have anything for her at his campus and that he was going to call the office to straighten out the matter. She was ultimately assigned to the position of Assistant Physical Education coach. Shortly after the beginning of the school year, Mr. Valent started making suggestive sexual remarks to Ms. Doe, to which she would consistently object. He would belittle her and tell her she did not do anything. He would change her daily assignment from being a P.E. coach on one day and a substitute teacher on another day. The actions of Mr. Valent were apparently designed to emphasize his control over Ms. Doe's continued employment, and served to degrade her self-esteem. Consistent with this policy, Mr. Valent would find numerous reasons to discipline or chastise Ms. Doe. Eventually, after he would chastise Ms. Doe for any minor violation, in escorting her out of his office he would grab her buttocks. On occasions when she would wear baggy shorts, Mr. Valent would begin to put his hand up her shorts as she was standing by his desk. Because of his tactics of intimidation, and because he was the main person in charge of discipline and continued employment at the Alternative Center, Ms. Doe did not feel she had any basis to complain, or anyone to whom she could complain. As a result, Mr. Valent's actions began to get more direct and offensive. After a while, he would no longer simply put his hand up her shorts, but would actually insert his fingers into her vagina. Although she continued to object to him, telling him she did not want to be touched, he refused to curtail his behavior. As a result, Ms. Doe eventually felt there was nothing else she could do if she was going to keep her job.

EXHIBIT "A"                                                      PAGE 1 OF 3

On Friday, January 28, 2000, Ms. Doe left campus to buy hamburgers for some of her students.  While she was out, however, she was involved in an auto accident.  When she contacted the office to notify Mr. Valent that she would not be able to return that day because of the accident, he became upset and scolded her for leaving campus without signing out.  Although Ms. Doe tried to apologize, Mr. Valent told Ms. Doe to talk to him when she returned, and he hung up on her.  When she returned to work on Monday, January 31, 2000, she was notified by the secretaries that Mr. Valent had been very upset.  On the suggestion of one of her co-workers, she sent Mr. Valent some flowers to his house because he had called in sick, in an effort to appease him and curb his anger.  When Mr. Valent returned on Tuesday, February 1, 2000, he did not speak with Ms. Doe, and he did not speak with her again until Wednesday, February 2, 2000.  At that time, he got upset at Ms. Doe and lightly spanked her on her buttocks and told her to behave next time.  She did not complain about this action because she felt she "deserved" some form of punishment, and she did not want to lose her job.  Again, Mr. Valent used his supervisory position to take advantage of Ms. Doe as a form of discipline.

At some time in February, 2000, Mr. Valent notified Ms. Doe that he had to evaluate her, but he did not know what to evaluate her as, perhaps because her daily assignment had changed so often.  He then told her that he "had an evaluation in mind" for her, and he told her to meet him at his office.  The following day, Mr. Valent had Ms. Doe report to his office.  When she entered his office, he gave her a pair of green underwear, which he told her to put on.  Not understanding what form of evaluation or discipline he intended to undertake, she complied with his orders and returned to her classroom.  He later called Ms. Doe to meet him in an unoccupied classroom.  He then told her to get on a table, and he took polaroid photographs of her.  As he was taking pictures, he told her to bend over and use her fingers to open her vagina, so he could photograph her nude.  By this time, Ms. Doe felt she could not stop because she needed her job, and Mr. Valent had already established a pattern of dominance and overt criticism for every minor violation.  Because of his position as the last authority at this campus, Ms. Doe felt that if she did not comply with his requests, he would have her fired.  After taking the photographs, Mr. Valent ordered Ms. Doe to perform oral sex on him, which she did.  After he ejaculated into her mouth, she cleaned herself with his handkerchief, and he sent her to her room.

A short time later, Mr. Valent approached Ms. Doe and told her he had more film.  Although she complained that she should not have to be subjected to any further pictures, he ordered her to go back to the unoccupied classroom.  At around 12:30 p.m. or 1:00 p.m., she reported back to the classroom.  After again taking further photographs, he directed her to lay on the table, and he penetrated her vagina with his penis.  After ejaculating in her, he again released her.

EXHIBIT "A"                                                          PAGE 2 OF 3

One morning in February 2000, while Ms. Doe was preparing for class in the In-School Suspension classroom, Mr. Valent entered the room, before any children had arrived. After locking the door behind him, he told Ms. Doe "Oh you don't have any students. Remember your evaluation." He then instructed her to go to a corner of the room and help him to "jack off" or manually ejaculate. He then unzipped his pants and told her to perform oral sex on him as well. He told her to perform oral sex on him, and once he was sufficiently aroused, he would bend her over and have coitus with her. The language he used, however, was much more vulgar and offensive. Again feeling she had no alternative but to comply with his orders, Ms. Doe began to perform oral sex on him. As she was performing oral sex on him, Mr. Valent ordered her to take off her shorts, which she began to do, when a security officer with some students knocked on the door. Mr. Valent hurriedly dressed and left, although the security guard saw Mr. Valent tucking in his shirt and that Ms. Doe's shirt had not been tucked in. The security guard apparently did not take any action to investigate this matter.

On March 9, 2000, Mr. Valent again told Ms. Doe to remember her evaluation, explaining that this would be the last one. Although she complained about any need for any further "evaluation," he insisted that she check out at noon and go home and that he would meet her there later. When Mr. Valent arrived at her house, he again instructed her to provide oral sex to him. He then instructed her that once she had performed oral sex, that he would bend her over and they would have coitus. After they had achieved coitus and he ejaculated, Mr. Valent showered and left for a meeting. Concerned about her health, Ms. Doe went to a doctor, who informed her she had contracted pubic lice. Shortly afterwards, as a result of the added stress and humiliation caused by having to engage in sex as part of her employment evaluation, Ms. Doe was admitted to the hospital on March 12, 2000, suffering from epileptic seizures.

EXHIBIT "A"                                                                    PAGE 3 OF 3

# EXHIBIT "B"

CVisPDF – www.fasiso.com

Texas Law Review
November, 1982

Note

**\*547 WHO IS SUING YOU?:  JOHN DOE PLAINTIFFS IN THE FEDERAL COURTS [FNa]**

William S. Kleinman

Copyright 1982 by the Texas Law Review Association; William S. Kleinman

I.  Introduction

In modern lawsuits, revealing the identity of the plaintiff is a practice so common that most litigants take it for granted.  At common law a defendant had a right to know his accusor, [FN1] and the Federal Rules of Civil Procedure purport to preserve this right by requiring a plaintiff to state his proper name in the caption of his pleadings. [FN2]  In recent years, however, plaintiffs have requested on occasion that their names be withheld from the pleadings to prevent either retaliation by the defendant or social repercussions that would dilute the value of the suit's success.  Although these 'Doe-plaintiff' suits may appear to be a radical procedural innovation  [FN3] in light of the long standing common law and statutory traditions of disclosure, [FN4] most courts that have considered the \*548 issue have expressed approval of the practice and accepted it as a permanent competent of federal procedure. [FN5]

The development of the Doe-plaintiff procedure has followed a typical course of common law evolution.  Confronted with a general prohibition against anonymous suits, [FN6] courts have endorsed the prohibition but have developed exceptions to it. [FN7]  As the exceptions have become numerous and cumbersome, courts have attempted to categorize them, [FN8] but a policy to justify any exception at all has yet to be articulated.  The lack of an articulated polic is understandable, since no statute specifically provides for Doe-plaintiffs, no Supreme Court authority is directly on point, [FN9] and no lower court opinion on the subject has attracted any significant following.  The unfortunate consequence \*549 of this lack of guidance is inconsistent decisionmaking. [FN10]

Thus, there exists a clear need for a standard.

The most recent variation on the categorization approaches is Southern Methodist University Association of Women Law Students v. Wynne and Jaffe [FN11] (SMU).  In this case, a Fifth Circuit panel attempted to distill from the cases setting forth exceptions a set of characteristics common to Doe- plaintiffs.  The resulting SMU rule allows an anonymous-plaintiff suit if the plaintiff fits the 'character profile' [FN12] announced by the court.  The SMU rule typifies theproblem common to all the cases categorizing the exceptions:  the rule unduly limits Doe-plaintiff suits to those involving fact patterns previously recognized as amenable to the practice.  Thus, the SMU rule does not look beyond the prohibition-exception approach.  Rather, it tolls the ad hoc development of the practice, apparently assuming that all acceptable exceptions have been recognized previously, and that all recognized exceptions are acceptable.  If either of these assumptions is incorrect, however, the limitations imposed by the SMU rule are arbitrary, and the evolution of the procedure has been slowed if not halted.

The current case law suggests that something is awry with the SMU approach.  Although the case law addressing the propriety of the Doe-plaintiff procedure is expanding, [FN13] inequity mars the dividing line \*550 between cases that have and have not qualified for Doe-plaintiff treatment.  Some courts have been liberal in allowing anonymous suits, [FN14] others have been reluctant. [FN15]  The inconsistent application of the practice demonstrates the inadequacy of an ad hoc approach to the administration of this innovative doctrine and points to the pressing need for a considered method for identification of the cases warranting Doe-plaintiff designation.

If courts are to have an equitable rule to guide them in deciding when to grant Doe-plaintiff status, they must look beyond fact-situation limitations and develop a comprehensive rationale that considers both the positive and negative aspects of the practice and balances the interests present in any given case.  This Note sets out such an approach.  Part II demonstrates the legitimate need for the Doe-plaintiff alternative and explains the competing interests of the defendant and the general public.  Part III examines and critiques three recently

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00182 Document 8 Filed in TXSD on 01/29/2001 Page 16 of 31

suggested approaches, and Part IV sets out a framework for implementing the Doe-plaintiff procedure that maximizes its use where it is needed most, yet minimizes its disadvantages, suggesting a procedural compromise between the interests involved.

II. The Elements of the Anonymity Problem

A. The Plaintiff's Interest in Anonymity

1. Retaliation by the Defendant.--The traditional openness of the judicial system allows the defendant to identify his opponent. The *551 plaintiff's name generally appears in the pleadings, [FN16] and the defendant may depose the plaintiff to learn details about the suit. [FN17] The parties may meet in settlement negotiations or in the courtroom. In the typical lsuit, then, the defendant knows who brought him to court, forced him to incur legal fees, and perhaps recovered a judgment against him. Although opposing litigants generally do not have an amicable post-trial relationship, [FN18] most accept the consequences of litigation. Occasionally, however, a lawsuit may involve circumstances so volatile that the defendant, discontent with the normal adjudicative process, retaliates against the plaintiff.

Extrajudicial retaliation may be very bold or very subtle. When the plaintiffs in Doe v. Stegall [FN19] brought a suit to enjoin prayer in the public schools, the school board met and discussed violent retaliation against the plaintiffs. The law students in SMU sued two law firms for sex discrimination in hiring, [FN20] but feared that even if they prevailed, the law firm would never hire the female plaintiffs. [FN21] In such situations, the plaintiff without Doe-status must choose between making himself susceptible to retaliation and not pursuing the suit.

A judicial remedy may exist following retaliation, but such relief is often imperfect. If the defendant assaults the plaintiff, the plaintiff can resort to criminal or tort law for relief. No guarantee exists, however, that the plaintiff will prevail in the retaliation suit. A monetary damage award may compensate the plaintiff, or his survivors, but it will not return him to his former self. Likewise, an employment discrimination statute may provide that an employer may not discriminate against an employee who sues him under the statute, [FN22] but when close professional relationships are necessary (as in a law firm, for example), a *552 mandate of friendly relationships may be impractical. Hence, once the retaliation takes place, the court may be unable to restore the plaintiff's remedy in any real sense.

Despite the problem of actual retaliation, the gravamen of the Doe- plaintiff problem is the danger that the case will never get to court in the first place. If the defendant's intimidating tactics prevent the plaintiff from filing suit, the defendant has successfully thwarted the judicial system's ability to settle the dispute in a nonviolent, civilized fashion. Ironically, the more volatile situations--those presenting the greatest chance of intimidation--are the ones most in need of judicial resolution. The Doe- plaintiff procedure provides a practical answer to this problem. When the plaintiff is hidden behind a veil of anonymity, the defendant does not know against whom he should direct retaliation. The plaintiff, certain that he is safe, will bring his complaint to court.

2. Dilution of Relief.--The traditional openness of our judicial system also allows the public to determine the identity of a plaintiff. [FN23] In the typical lawsuit, the facts of the case have so little sensational value that the publicity accompanying the litigation will not adversely affect the plaintiff. Consequently, most plaintiffs are not apprehensive about using their real names. In some lawsuits, however, the facts of the case are so embarrassing or incriminating that the value of any judicial relief will be diluted or even nullified by public reaction to the plaintiff or by the reactions of specific individuals not directly involved in the suit.

This dilution of the plaintiff's remedy can occur in several ways. For example, in Roe v. New York, [FN24] minor plaintiffs challenged the conditions in a home for juvenile delinquents. They feared that if their status as juvenile delinquents became known, the accompanying stigma would hinder their assimilation into the community. They moved to proceed anonymously. In Roe v. Ingraham, [FN25] the plaintiffs claimed that a statutory scheme by which the government kept track of individua *553 use of prescription drugs violated their right of privacy. Since use of their real names in the suit would announce to the government that they used

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00182   Document 8   Filed in TXSD on 01/29/2001   Page 17 of 31

various prescription drugs, thereby disclosing the very information they claimed was private, the plaintiffs moved to proceed anonymously. The plaintiff in Doe v. Lally [FN26] was an inmate seeking injunctive and declaratory relief after he was homosexually raped. The court noted that if the plaintiff became known as a pare victim other inmates would single him out as 'an easy mark, thereby increasing the likelihood of further sexual assaults.' [FN27] To avoid such physical harm, he requested Doe status. Constitutional challenges to criminal statutes may involve yet another deterrence to filing suit, if the plaintiff fears that he may incriminate himself if the suit is unsuccessful. [FN28] In each of these examples, the plaintiff's fear of stigmatization, loss of privacy, retaliation by a nonparty, or self-incrimination caused him to question the net value of any relief he might obtain if that relief were accompanied by the repercussions he sought to avoid.

The intangible nature of a diluted remedy makes the injury quite vexatious. [FN29] A plaintiff may have a case worthy of either compensatory or injunctive relief, yet confront severe social repercussions when he walks out the courthouse door. Moreover, fear of such repercussions may keep the plaintiff out of court entirely. In either case, the court's attempt to administer a just result is frustrated.

The Doe-plaintiff procedure can alleviate this problem. When the plaintiff sues anonymously, the community does not know where to direct its scorn, and the plaintiff does not have to run the gauntlet just for suing on embarrassing facts. Thus, the potential relief remains intact and undiluted, and the plaintiff is not discouraged from suing.

B. The Defendant's Interest in Disclosure

The use of Doe-plaintiffs raises several major problems for the defedant. *554 Most are procedural, stemming from the frustration of one of the fundamental assumptions of the procedural system--that the parties will be known to one another. [FN30] When the plaintiff's identity is unknown, the defendant cannot challenge the plaintiff's standing, plead res judicata, or engage in full discovery. Thus, the defendant in a Doe case may be left to flounder about like a procedural fish out-of-water. Moreover, the availability of

anonymity may encourage a plaintiff to engage in less responsible litigation to harass a defendant or to damage his reputation.

1. Procedural Disadvantages.--As stated above, anonymous suits hamper the defendant's ability to obtain discovery. The discovery techniques set out in Rule 26 of the Federal Rules of Civil Procedure are unavailable to the defendant in a Doe suit if they will reveal the name of the plaintiff. Obviously, inability to obtain discovery makes the preparation of a defense difficult. For example, if a plaintiff alleges that a defendant denied her employment on the basis of sex, the defendant may need to identify the plaintiff to determine if there were other reasons were for not hiring that particular applicant.

Whenever a defendant's ability to discover is hampered, he bears an increased risk of being unable to plead affirmative defenses [FN31] and assert compulsory counterclaims. [FN32] Furthermore, since the defendant who does not know the identity of his accuser is unable to plead res judicata, he is susceptible to repeat litigation.

2. Damage to the Defendant's Reputation.--The use of the plaintiff's true name discourages frivolous lawsuits and promotes responsible behavior in the courtroom. Like the ante in a poker game, forcing the plaintiff to stake his fear of embarrassment or retaliation against the defendant's good name guarantees that only serious players use the finite number of seats at the table. When the plaintiff puts his name on the pleadings, he assures the court that there is substance to his claim and thus provides the defendant with an important measure of protection against potentially damaging frivolous suits.

This assurance of responsible litigation is especially important to *555 the defendant, for just as the plaintiff may damage his own reputation by suing, he may also damage the defendant's reputation. Certain lawsuits, such as those alleging sex discrimination, race discrimination, antitrust violations, and civil fraud, stigmatize the defendant. Merely filing such a lawsuit can damage a defendant's personal or business reputation. [FN33] Thus, regardless of the merits of the defendant's case, the threat of a frivolous lawsuit takes on an unduly coercive character. Just as the worthy plaintiff may avoid the courts because of threats made by the defendant, the worthy defendant may

avoid the courtroom the settle the suit merely to avoid damage to his reputation.

C. The Public's Interests in Anonymity and Disclosure

1. Maintenance of the Judicial System as the Primary Means of Settling Disputes.--Stigmatization of and retaliation against the plaintiff are unfortunate by-products of an open judicial system. Under certain circumstances, these social costs may wholly nullify a plaintiff's remedy, making the net result of the plaintiff's successful suit injury instead of relief. When society forces a plaintiff with a meritorious case to pay unwarranted social costs for his use of the judicial system, it emasculates the judicial system's ability to use the law to reallocate social costs and assure justice. If outside pressures become so great that a plaintiff's considered choice is to avoid the courts, then the judicial system fails miserably. Moreover, disputes that inspire responses designed to keep the plaintiff from reaching the courthouse are the disputes in the greatest need of judicial resolution. [FN34]

*556 2. Personal Integrity of the Litigants.--On the other hand, requiring a plaintiff to identify himself harnesses the plaintiff's desire to maintain his good name, thereby promoting integrity and responsibility in the plaintiff's decision to sue. [FN35] Requiring him to state his name further serves as a selective barrier to frivolous litigation, favoring the responsible, nonfrivolous lawsuit, preserving scarce judicial resources for meritorious cases, and maintaining the integrity of the judicial system as an instrument of justice. ' T here is something to be said . . . for the notion that one who strikes at the king should do so unmasked or not at all.' [FN36]

3. Standing to Sue.--The standing doctrine [FN37] is grounded in the constitutional grant of judicial power only to decide 'cases' and 'controversies.' [FN38] Courts have long interpreted the case or controversy requirement as precluding decisions in purely hypothetical cases. [FN39] Consequently, federal court jurisdiction attaches only when a real person who has suffered an 'injury in fact' [FN40] initiates a suit. If an anonymous lawsuit involves a fabricated plaintiff or a plaintiff who has not suffered an actual injury, the court could be deciding a case beyond its *557 jurisdiction. [FN41]

Several legitimate public interests support the standing requirement. First, a party must have 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions[.]' [FN42] An uninjured, anonymous plaintiff suing only to harass the defendant may not have the motivation to 'sharpen the presentation of issues.' Indeed, such a plaintiff may well wish to avoid 'concrete adverseness' altogether. Second, the concept of separation of powers, especially in constitutional matters, requires that the federal courts invalidate an act of Congress only when absolutely necessary. [FN43] Thus, the argument goes, courts should limit themselves to rulings necessary to repair actual injuries and should avoid indiscriminately testing the constitutionality of statutes. [FN44] The requirement that every plaintiff have an injury in fact is one check on courts that might otherwise be tempted to examine the constitutionality of statutes whenever an opportunity arose. Third, a plaintiff without standing motivated not by a desire to redress injury but by a desire to harrass and debilitate the defendant has used the court unscrupulously as a tool for his misdeeds. In so doing, he injures not only the targeted defendant, but the integrity of the judicial system as well.

III. Current Approaches to Doe-Plaintiff Practice

Ideally, a Doe-plaintiff doctrine should be based on a rationale that encapsulates the judicial system's concept of how best to handle the competing interests of anonymous suits. Articulation of this rationale, however, has proved difficult for the courts. Some courts would allow anonymous suits only when disclosure of the plaintiff's name encroaches on the plaintiff's privacy. [FN45] Others would limit the procedure to situations in which disclosure inflicts the injury that the plaintiff *558 seeks to avoid by his suit. [FN46] Another court would use a balancing test to decide whether to allow anonymous suits. [FN47] None of these approaches, however, is adequate.

In the privacy cases, the courts have agreed that privacy losses can effectively dilute the value of judicial relief. What the courts mean by 'privacy,' however, is not clear. It evidently bears a strong resemblance to constitutional privacy, but the match-

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

up is not perfect. The constitutional right of privacy and recognition of the dilution problem are harmonious in that both seek to protect individuals from the harm of revealing certain facts to the public, but the constitutional right is often limited to matters of intimacy and family. [FN48] A suit in which the plaintiff alleges job discrimination [FN49] is in no way intimate, but the stigmatization accompanying such a suit may cause the business community to blacklist a plaintiff with a record of suing employers, thus nullifying or at least diluting the relief granted. Characterization of the dilution doctrine in terms of 'privacy' is therefore helpful for the purposes of doctrinal analysis, but the persistence of 'privacy' as the outer limits of the Doe-plaintiff procedure has produced inequitable results in the federal courts, where worthy cases have been denied Doe-plaintiff treatment. Under the privacy dtrine federal courts have held that the embarrassment and scorn associated with having an abortion is an anathema, but the embarrassment and scorn associated with performing an abortion is not. [FN50] The discomfort caused by these scarlet letters is *559 indistinguishable in the eyes of the stigmatized.

The problem with the privacy requirement as applied to the Doe- plaintiff cases is that it is not grounded in any considered rationale, making its application arbitrary. Courts allow a plaintiff to withhold his name in privacy cases because disclosure, accompanied by a privacy intrusion, dilutes the value of the relief sought. However, if the underlying reason for the exception in privacy cases is valid, then that rationale should apply whenever disclosure of the plaintiff's name would significantly dilute the value of judicial relief.

Another possible approach is to allow Doe-plaintiffs only when necessary to avoid total nullification of relief by an identical injury. Roe v. Ingraham [FN51] exemplifies the tension presented in such a case. Plaintiffs claimed that a program requiring them to inform the state of their use of prescription drugs violated their right of privacy. If the plaintiffs sued to enjoin the program, however, the state would discover their use of the prescription drugs by virtue of the suit. The court allowed the anonymous suit because disclosure of the plaintiffs' identities would sustain 'the injury which by this litigation they sought to avoid.' [FN52] Ninth Circuit Judge Sneed has suggested that the doctrine

should be limited to these catch-22 situations. [FN53]

Allowing Doe-plaintiff status in these cases is desirable because without it there can be no remedy at all. Still, the policy of avoiding ineffective relief should not apply only to nullification by an identical injury, as Judge Sneed suggests. For example, in Doe v. Bolton, [FN54] the injury addressed by the suit and the injury of disclosure were not identical. Governmental interference with the right to an abortion was the injury giving rise to the cause of action, but revealing the plaintiff's request for an abortion to the general public was the injury of disclosure. The disjunction between injuries was more severe in Doe v. Stegall, [FN55] in which governmentally compelled religious worship was the injury giving rise to the litigation, and violent public retaliation was the injury of disclosure. While the injuries prompting the suit and the injuries caused by disclosure were not identical, the second injury in each of these cases was certainly significant enough to cause the plaintiff not *560 to pursue a remedy for the first injury. Thus, the dilemma in these cases was no less severe than that where the suit brought about the very injury that the plaintiff sought to avoid.

Doe v. Stegall suggests a third approach for deciding which cases are appropriate for Doe-plaintiff treatment. The Fifth Circuit panel in Stegall criticized the rigidity of the SMU character profile and suggested balancing public and private interests as an alternative. The court offered no guidance, however, on what elements should be balanced nor on how they should be weighted. [FN56] Thus, Stegall's 'test' does not answer the question of when to allow an anonymous suit, but merely poses it. There is no point in abandoning one approach in favor of another if both approaches are really ad hoc.

While Stegall does not take the next step and give the lower courts guidelines for implementing this balance, its suggestion that balancing is the preferred approach is meritorious. A formal doctrine of decisionmaking, such as the rigid rule SMU promulgates, by its nature prohibits the trial judge from basing his decision on information not specifically invoked by the rule. [FN57] By contrast, a nonformal doctrine, such as the balancing approach adopted by Stegall, gives the trial judge

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00182   Document 8   Filed in TXSD on 01/29/2001   Page 20 of 31

discretion in determining what information will form the basis of the decision. The discretion to allow anonymous suits is best left with the trial judge because his contact with the parties puts him in the best position to evaluate the risk that the defendant's actions will actually dilute relief or keep the plaintiff from coming to court.

Of course, formalism and nonformalism are only opposite ends of a spectrum, and although a formal rule may preclude the use of certain information in the trial judge's decision, it may nonetheless be a good *561 rule if the rulemaker has considered that same information in promulgating the rule. [FN58] Thus in developing a Doe-plaintiff doctrine, this Note proposes a balancing approach that allows courts discretion in deciding individual cases, yet incorporates some elements of formalism to guide the judiciary in making those decisions.

IV. A Proposed Rule for Allowing Doe-Plaintiffs

In the right set of circumstances, then, an anonymous lawsuit enables an otherwise intimidated plaintiff to use the courts and protects him from unwarranted repercussions for having done so. The proposed approach to allowing such lawsuits is two-pronged. First, a court must determine whether the plaintiff has established a prima facie case that Doe-plaintiff status in his particular circumstances effectively furthers the procedure's policies. Then, the court should determine whether this prima facie case is rebutted because the procedure presents insurmountable problems to the defendant. If procedural compromises will enable the defendant to overcome those problems while enabling the plaintiff to maintain anonymity, then no disqualification should occur. If the harm to the defendant cannot be overcome, the court should require disclosure.

A. Determining Whether a Case Is Worthy of Doe-Plaintiff Treatment

1. Retaliation.--The United States Supreme Court has never ruled directly on the use of Doe-plaintiffs to avoid retaliation, but it has recognized the urgency of the problem. In 1957 Congress created the United States Commission on Civil Rights [FN59] (Commission) to 'investigate allegations . . . that certain citizens of the United States are being deprived of their right to vote and have that vote

counted by reason of their color, race, religion, or national origin . . ..' [FN60] The Commission held public hearings in Alabama [FN61] and Louisiana [FN62] and documented numerous instances of discrimination and retaliation designed to discourage blacks from voting. [FN63] The Commission found that keeping the names of all complainants secret was essential in carrying out its statutory *562 duties. [FN64] Louisiana officials challenged this procedure in federal court, [FN65] claiming that it violated the due process clause of the fifth amendment. [FN66] Of particular interest is the State's claim that it needed the names of the complainants to bring perjury charges against them. [FN67] The Supreme Court refused to order disclosure of the complainants' identities, holding that because the Commission proceedings were purely investigative, withholding complainants' names was within the bounds of the due process clause. [FN68] Although the Court did not have the opportunity to rule on the use of Doe-plaintiffs in an adjudicative environment, [FN69] the majority recognized that an anonymous complainant's fear or retaliation can be well founded and worthy of judicial attention. [FN70]

Most lower courts support using the Doe-plaintiff procedure to prevent retaliation. The court in Doe v. Stegall allowed the plaintiffs to sue anonymously to enjoin prayer in public schools after they established a threat of violent retaliation, [FN71] and the court in Glover v. Johnson allowed prisoner-plaintiffs to challenge prison conditions anonymously when they feared retaliation by prison officials. [FN72] In SMU, however, the plaintiffs feared that the law firm they sued would not hire them. That court attempted to synthesize the case law by distilling the characteristics common to the previous suits that had allowed Doe-plaintiffs. Notably, the court did not find the danger of retaliation to be a common characteristic. [FN73] Since the plaintiffs did not *563 fit the court's characteristic profile, they were ordered to reveal their names. Rather than do so, the plaintiffs dropped the suit. [FN74]

Lower courts should recognize a prima facie need for Doe status whenever the plaintiff presents reasonable evidence to support a fear that the defendant will retaliate against him. The court should recognize threatened retaliation in all forms: physical, social, or economic. Extrajudicial

Case 1:00-cv-00182  Document 8  Filed in TXSD on 01/29/2001  Page 21 of 31

retaliation directed against a plaintiff is a flagrant challenge to the legitimacy of the court system. If they are to remain vital as the primary means of settling disputes, the courts must hear these cases, even if doing so produces some lawsuits with anonymous plaintiffs.

The courts necessarily will have to speculate when they decide whether a reasonable chance of retaliation exists. The motion to proceed anonymously is usually made at the inception of the lawsuit when the court is in a poor position to determine whether the plaintiff's claim has substance. Consequently, by allowing an anonymous suit, the judge takes the chance that he is allowing an unwarranted blow to the defendant's reputation. [FN75] Still, the court is also in an inadequate position to predict the defendant's reaction to the suit. Consequently, by not allowing an anonymous suit, the judge risks that the plaintiff will drop a meritorious suit or that the defendant will retaliate.

The judicial system must choose between two possibilities: one, allowing plaintiffs to use the courts as tools of vindictiveness and two, allowing defendants to deprive the courts of their ability to settle disputes. Imperfection is inherent in any judicial system. Nonetheless, the courts provide a social safety value. They assure a civilized, supervised, nonviolent resolution of disputes. [FN76] An inequitable result inflicted by the operation of a principally equitable system is preferable to a dubious result inflicted by ruffians. Thus, courts should err on the e of caution, allow the anonymous suit, and bring the conflict within *564 the jurisdiction of the court. Moreover, since the trial judge can reveal the plaintiff's name later if he decides it is necessary, he should assume a prima facie showing of need for an anonymous suit whenever he finds a reasonable chance that a defendant will retaliate.

2. Dilution of Relief.--Courts should allow Doe suits whenever a traditional suit would result in dilution of the successful plaintiff's relief. The Supreme Court has recognized this problem of extrajudicial nullification of relief. In National Association for the Advancement of Colored People v. Alabama ex rel. Patterson, [FN77] the State of Alabama attempted to enjoin the activities of the NAACP and oust it from the state on the grounds that the association had failed to comply with

Alabama's foreign- corporation registration requirements. The state trial court had held the association in contempt for refusing to disclose the names of its numbers. [FN78] The NAACP convinced the Supreme Court that on previous occasions, revealing the identities of its members had 'exposed these members to economic reprisal, loss of employment, threat of physicial coercion, and other manifestations of public hostility.' [FN79] The Court held that under these circumstances, disclosure of the identities of the association members was likely to affect adversely the ability of the members to advocate their collective beliefs. Therefore, the Court reasoned, the state court's disclosure order unconstitutionally infringed on the members' first amendment right of association. [FN80] Thus, the Court recognized that under certain conditions disclosure of the identity of the parties [FN81] to a lawsuit leads to private discrimination *565 and retaliation by nonparties.

The lower courts, too, have seen the need for anonymity in dilution situations. While most cases have involved privacy rights or fear of social stigma, [FN82] others consider plaintiff self-incrimination upon challenging a criminal statute, [FN83] and retaliation by a nonparty. [FN84] Courts should consider allowing a Doe suit whenever the social costs to the plaintiff are significant enough to dilute the value of his relief, whatever the source of the dilution. [FN85] In considering the prima facie showing of dilution, however, the courts should draw a major distinction between anonymous suits against private defendants and anonymous suits against public defendants. Because private defendants have damageable reputations, they share the plaintiffs' fears of social costs. [FN86] To prevent the Doe-plaintiff procedure from becoming a tool of harassment, courts should allow anonymous lawsuits against private defendants only in the most compelling cases. By contrast, many suits against public defendants endanger no one's reputation and need not be limited in this fashion.

The Doe-plaintiff doctrine would be seriously flawed if it addressed only the plaintiff's extrajudicial costs. In a suit where the prospective Doe-plaintiff fears dilution of relief and the private defendant fears that being sued will damage his reputation, the potential social costs to each party offset one another, and the protection of the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00182  Document 8  Filed in TXSD on 01/29/2001  Page 22 of 31

plaintiff's reputation is not alone a worthwhile ground for allowing a Doe-plaintiff suit. Furthermore, where the defendant is not the cause of the dilution of the plaintiff's remedy, there is no reason to force the defendant into a procedurally disadvantageous position. Therefore, in dilution cases the courts should adopt a presumption against anonymous suits against private defendants. A plaintiff can overcome that presumption, and establish his prima facie case, by showing that the private *566 defendant will experience damage far less than the plaintiff if the latter remains anonymous.

The situation with public defendants is quite different. Most reported Doe-plaintiff suits against public officials challenge official actions taken within the bounds of statutory authority and are actually challenges to the operation of the statutes. [FN87] As long as a suit does not allege official misconduct, no one's reputation is in jeopardy. While allowing anonymous suits against the government may promote litigation, it does not follow that allowing anonymous suits will subject the government to a radical increase in frivolous suits. Since no one's reputation is at stake, a frivolous plaintiff cannot do the same damage to the government that he can do to a private defendant. Thus, the expense of litigation will protect the government sufficiently from frivolous suits. Furthermore, the courts should encourage meritorious suits challenging the validity of statutes. Judicial review of statutory authority has become an important part of the lawmaking process, and a willing plaintiff is essential to any judicial challenge of legislative action. The monetary cost of challenging a law is a significant sacrifice. Absent some reason for subjecting the plaintiff to public scrutiny, the courts should presume a prima facie showing of need for an anonymous suit against the government whenever the defendant can overcome the procedural problems of a Doe-plaintiff suit.

B. Determining Whether a Prima Facie Case Must Be Disqualified

In many theoretically attractive anonymous suits, the defendant may be subject to a number of procedural problems. The defendant who does not know his opponent's identity may be sued by a plaintiff who in fact lacks standing, may have difficulty establishing the identity of his opponent

for purposes of res judicata, and may have difficulty obtaining adequate discovery. Thus, in protecting the plaintiff, an anonymous lawsuit may prejudice the defendant's ability to present his best case. These problems, however, are often surmountable. The courts have developed several interesting procedural innovations that protect the defendant's interests while preserving the plaintiff's anonymity. *567 Thus, after a court has decided that a plaintiff is worthy of anonymous treatment, it must consider whether these procedural innovations will protect the defendant. If the net harm to the defendant is minimal, the anonymous suit should proceed.

1. Lack of Standing.--An anonymous lawsuit may have no real plaintiff. [FN88] Thus, the defendant risks being sued by nonparties motivated not by a desire to correct illegal behavior, but by a desire to harass or debilitate the defendant, and the courts risk hearing a case beyond their jurisdiction. Courts, however, have overcome standing questions. At least one federal court has allowed an anonymous lawsuit to proceed based only on the attorney's representations that the 'fictitious names are actually representative of real and specific aggrieved individuals.' [FN89] Such a procedure, however, may arouse suspicion. The courts may keep their reputations untarnished if they take a more active role in certifying the plaintiff. The Connecticut courts require that the prospective anonymous plaintiff 'acquaint the court of his desires and establish the fact that the parties and issues are real although the names used are fictitious.' [FN90] One federal court even took the plaintiff's testimony in camera. [FN91]

2. Res Judicata.--Many anonymous suits against the government are class actions. [FN92] Since these suits may fix the rights of very broad classes of plaintiffs, the res judicata problems are minimal. Actions brought by individual plaintiffs, however, are not so simple. It would be impossible for a defendant to assert that a second claim is barred it he did not know the names of the plaintiffs in each action. [FN93] Once *568 again, this problem may be overcome with judicial participation in the certification of the plaintiff. The courts should keep records of the plaintiff's real names. If a complaint looks familiar to a defendant, the defendant should have one court contact the other to see if the plaintiffs are the same.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

3. Discovery.--When the defendant does not know who is suing him, he will have difficulty obtaining the necessary discovery. [FN94] In some cases, the facts may be uncontroverted or simple, leaving little room for dispute. [FN95] In others, the parties may move for summary judgment before discovery is requested. In these situations, lack of discovery need not block an anonymous suit. Most situations, however, are not as simple. Often discovery is essential to a defense on the merits.

Again, the courts have developed several solutions that make this problem less significant than it first appears. One federal court held that it would allow an anonymous suit to proceed until the defendant showed that an inability to obtain discovery would prejudice his case. [FN96] When discovery is vital, testimony or affidavits could be taken in camera. [FN97] Some courts have revealed the names of the plaintiff only to the defendant's attorneys, ordering the defendant's attorneys not to pass the information to their client. [FN98] Although such a court order may not foster an ideal attorney-client relationship, it may be the court's only option in a complicated fact situation if the plaintiff fears retaliation by the defendant. Another solution is to reveal the plaintiff's identity to the defendant and the defendant's attorneys, but to omit the plaintiff's name from the published decision. Such a procedure is particularly reasonable when one of the plaintiff's principal fears is dilution by public reaction. [FN99] The Supreme Court has indicated approval of using a fictitious name in the published decision under these circumstances. [FN100]

*569 V. Conclusion

A plaintiff may have a valid fear of repercussions upon filing a law suit. If he has a reasonable fear of retaliation by the defendant, the court should grant him Doe status and institute procedural compromises in favor of the defendant. If his fear is based upon nonparty or public response, the court should protect the private defendant more carefully, allowing the suit only when the plaintiff's need is severe and the potential repercussions against him are much stronger than the potential stigma that will plague the defendant. On the other hand, if a public defdant is involved, and there are no countervailing concerns, the courts should be quick to allow the Doe suit and formulate the appropriate procedural compromises necessary to maintain the integrity of the proceeding.

[FNa] The author wishes to thank Michael J. Churgin, Professor of Law, The University of Texas School of Law, and William C. Powers, Jr., Professor of Law, The University of Texas School of Law, for their comments and insight.

[FN1]. J. CHITTY, A TREATISE ON THE PARTIES TO ACTIONS, AND ON PLEADING 279 (7th ed. 1837); B. SHIPMAN, HANDBOOK OF COMMON-LAW PLEADING 465 (3d ed. 1923).

[FN2]. FED. R. CIV. P. 10(a) provides: 'Every pleading shall contain . . . the title of the action . . . [which] shall include the names of all the parties . . ..' See Roe v. New York, 49 F.R.D. 279 (S.D.N.Y. 1970) (holding that absence of names in pleadings renders filing ineffective to commence an action).

[FN3]. The procedure does have a basis in the Federal Rules of Civil Procedure:
    Upon motion . . . and for good cause shown, the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (1) that discovery not be had; (2) that the discovery may be had only on specified terms and conditions, including a designation of the time or place; (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery; (4) that certain matters not be inquired into, or that the scope of discovery be limited to certain matters; (5) that discovery be conducted with no one present except persons designated by the court . . ..
FED. R. CIV. P. 26(c) (emphasis added). Though the rule does not specifically authorize anonymous proceedings, it is clear that its intent is to provide courts with broad discretion in determining the scope of discovery. The rule suggests that special attention be given to the requests of parties seeking to limit discovery in order to avoid unjustified harassment or embarrassment. The standard the court is to apply is what 'justice requires.' Rule 26(c)(4) suggests an authorization for anonymous plaintiff proceedings when the defendant's interests would not be substantially compromised under this standard; Rule 26(c)(3) indicates that the defendant's

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00182   Document 8   Filed in TXSD on 01/29/2001   Page 24 of 31

choice of discovery methods is not the prime consideration. Rule 26(c)(5) clearly authorizes consideration of evidence or testimony in camera, and in a perhaps more attenuated way, may be read to authorize the anonymous plaintiff practice when, under the 'doing justice' standard, the defendant is not unfairly compromised.

[FN4]. At common law, public records were to be open for inspection by individuals with a legitimate interest--as opposed to a mere idle or speculative curiosity--in the information. See Colscott v. King, 57 N.E. 535, 536-38 (Ind. 1900) (taxpayers allowed access to revenue and spending records in order to determine whether any misappropriation of funds had occurred); Ferry v. Williams, 41 N.J.L. 332, 336-39 (1879) (holding that all persons are entitled to inspect public documents upon a showing of sufficient interest). Public officials were reviewed as mere custodians of such documents. See Younmans v. Owens, 28 Wis. 2d 672, 678-80, 137 N.W.2d 470, 472 (1965) (compelling mayor to disclose contents of district attorney's report of results of police investigation).

[FN5]. For cases that have discussed the use of Doe-plaintiffs, see infra note 13. Several courts recently have allowed Doe suits without even addressing the propriety of allowing an anonymous plaintiff. See Noe v. Metropolitan Atlanta Rapid Transit Auth., 664 F.2d 434 (5th Cir. 1981); Valley Family Planning v. North Dakota, 661 F.2d 99 (8th Cir. 1981); Doe v. New York City Dep't of Social Servs., 649 F.2d 134 (2d Cir. 1981); Doe v. Burwell, 537 F. Supp. 186 (S.D. Ohio 1982); Doe v. United States, 533 F. Supp. 245 (S.D. Fla. 1982) ; Coe v. Reynolds, 529 F. Supp. 488 (D.N.H. 1982); Doe v. O'Bannon, 91 F.R.D. 442 (E.D. Pa. 1981); Doe v. United States, 520 F. Supp. 1200 (S.D.N.Y. 1981); Doe v. Fahner, 516 F. Supp. 514 (N.D. Ill. 1981); Doe v. Alexander, 510 F. Supp. 900 (D. Minn. 1981); Suzuki v. Yuen, 507 F. Supp. 819 (D. Hawaii 1981), Doe v. Syracuse School Dist., 508 F. Supp. 333 (N.D.N.Y. 1981).

These cases should not be confused with the 'Doe-defendant cases' in which unknown defendants are pleaded as 'John Doe' to create diversity, defeat diversity, or toll the statute of limitations. See Note, Designation of Defendants by Fictitious Names--Use of John Doe Complaints, 46 IOWA L. REV. 773 (1961).

[FN6]. See supra note 2.

[FN7]. See Doe v. Mundy, 514 F.2d 1179 (7th Cir. 1975) (abortion); Roe v. Borup, 500 F. Supp. 127 (E.D. Wis. 1980) (parents accused of sexually abusing their child); Doe v. McConn, 489 F. Supp. 76 (S.D. Tex. 1980) (transsexuality); Doe v. Gallinot, 486 F. Supp. 983 (C.D. Cal. 1979) (mental illness); Doe v. Lally, 467 F. Supp. 1339 (D. Md. 1979) (personal safety); Doe v. Carleson, 356 F. Supp. 753 (N.D. Cal. 1973) (illegitimate or abandoned children in welfare cases); Doe v. Chaffee, 355 F. Supp. 112 (N.D. Cal. 1973) (homosexuality). But see Roe v. New York, 49 F.R.D. 279, 281 (S.D.N.Y. 1970) (strictly construing rule 10(a) as not allowing anonymous suits).

[FN8]. See, e.g., Southern Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe, 599 F.2d 707, 713 (5th Cir. 1979); Doe v. Rostker, 89 F.R.D. 158, 161-62 (N.D. Cal. 1981); Doe v. Deschamps, 64 F.R.D. 652, 653 (D. Mont. 1974) (per curiam); Roe v. Ingraham, 364 F. Supp. 536, 543-46 (S.D.N.Y. 1973) (denying motion to dismiss), 403 F. Supp. 931 (S.D.N.Y. 1975), rev'd sub nom. Whalen v. Roe, 429 U.S. 589 (1977). For a discussion of the development of the various categories of Doe suits see Note, Anonymity in Civil Litigation: The 'Doe' Plaintiff, 57 NOTRE DAME LAW. 580, 584-92 (1982).

[FN9]. Only a few Doe-plaintiff cases have come before the United States Supreme Court. They have received what some courts see as tacit approval, but the Court has not ruled directly on the procedure. In Poe v. Ullman, 367 U.S. 497 (1961), dismissing appeal from Buxton v. Ullman, 147 Conn. 48, 156 A.2d 508 (Conn. 1959), the Court merely noted: 'Plaintiffs in the cases . . . sue under fictitious names. The Supreme Court of Errors of Connecticut approved this procedure in the special circumstances of the cases.' Id. at 498 n.1. Roe v. Wade, 410 U.S. 113 (1973), the seminal challenge to anti- abortion legislation, originated in the federal district courts. See 314 F. Supp. 1217 (N.D. Tex. 1970). The Supreme Court said of plaintiff Jane Roe,

Despite the use of the pseudonym, no suggestion is made that Roe is a fictitious person. For the purposes of her case, we accept as true, and as established her existence; her pregnant state, as of

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

the inception of her suit in March 1970 and as late as May 21 of that year when she filed an alias affidavit with the District Court; and her inability to obtain a legal abortion in Texas.
410 U.S. 113, 124 (1973) (emphasis added).

Some lower federal courts interpret the actions of the Supreme Court in Poe v. Ullman and Roe v. Wade as implicit recognition of the acceptability of the Doe-plaintiff practice. See, e.g., United States v. Doe, 655 F.2d 920, 922 n.1 (9th Cir. 1981); Lindsey v. Dayton-Hudson Corp., 592 F.2d 1118, 1125 (10th Cir. 1978); Roe v. Ingraham, 364 F. Supp. 536, 541 n.7 (S.D.N.Y. 1973) (denying a motion to dismiss), 403 F. Supp. 931 (S.D.N.Y. 1975), rev'd sub nom. Whalen v. Roe, 429 U.S. 589 (1977). The Connecticut practice in Poe v. Ullman, however, will not serve as binding precedent in federal court and the Court in Roe v. Wade was careful to note that the existence of the fictitiously named plaintiff had not been challenged. The Court has also heard Plyler v. Doe, 102 S. Ct. 2382 (1982); Whalen v. Roe, 429 U.S. 589 (1977); Linda R.S. v. Richard D., 410 U.S. 614 (1973); and Doe v. Bolton, 410 U.S. 179 (1973) without directly ruling on the validity of Doe suits.

[FN10]. See infra notes 14-15 and accompanying text.

[FN11]. 599 F.2d 707 (5th Cir. 1979).

[FN12]. Id. at 713 (issues involving the 'utmost intimacy' or the disclosure of potentially self-incriminating information in suits against a public defendant).

[FN13]. See, e.g., Doe v. Colautti, 592 F.2d 704 (3d Cir. 1979); Doe v. Ceci, 517 F.2d 1203 (1st Cir. 1975)Cir. 1975)Doe v. Mundy, 514 F.2d 1179 (7th ; Doe v. Hale Hosp., 500 F.2d 144 (1st Cir.), cert. denied, 420 U.S. 905 (1974); Doe v. General Hosp., 434 F.2d 427 (D.C. Cir. 1970); Doe v. Department of Transp., Fed. Aviation Admin., 412 F.2d 674 (8th Cir. 1969); Doe v. Department of Justice, 93 F.R.D. 483 (D. Colo. 1982); Moe v. Dinkins, 533 F. Supp. 623 (S.D.N.Y. 1981); Doe v. McConn, 489 F. Supp. 76 (S.D. Tex. 1980); Doe v. Gallinot, 486 F. Supp. 983 (C.D. Cal. 1979); Doe v. Lally, 467 F. Supp. 1339 (D. Md. 1979); Doe v. New York Univ., 442 F. Supp. 522 (S.D.N.Y. 1978); Glover v. Johnson, 85 F.R.D. 1 (E.D. Mich. 1977); Doe v. Commonwealth's

Attorney, 403 F. Supp. 1199 (E.D. Va. 1975); Roe v. Ingraham, 364 F. Supp. 536 (S.D.N.Y. 1973); Doe v. Carleson, 356 F. Supp. 753 (N.D. Cal. 1973); Doe v. Chaffee, 355 F. Supp. 112 (N.D. Cal. 1973); Doe v. Gillman, 347 F. Supp. 483 (N.D. Iowa 1972); Doe v. Lavine, 347 F. Supp. 357 (S.D.N.Y. 1972); Doe v. Hodgson, 344 F. Supp. 964 (S.D.N.Y. 1972); Doe v. Swank, 332 F. Supp. 61 (N.D. Ill.), aff'd sub nom. Weaver v. Doe, 404 U.S. 987 (1971); Roe v. New York, 49 F.R.D. 279 (S.D.N.Y. 1970); Doe v. Hursh, 337 F. Supp. 614 (D. Minn. 1970); Doe v. Dunbar, 320 F. Supp. 1297 (D. Colo. 1970); Doe v. Shapiro, 302 F. Supp. 761 (D. Conn.), appeal dismissed, 396 U.S. 488 (1969).

[FN14]. One court stated that a plaintiff may sue anonymously when his interest in privacy outweighs the public's interest in judicial openness. Doe v. Stegall, 653 F.2d 180, 186 (5th Cir. 1981) (emphasizing, however, the 'special status and vulnerability of the child litigants . . . and the fundamental privateness of the religious beliefs . . . at the core of this suit').

[FN15]. One court held that under the Federal Rules, no suit can commence without the plaintiff's name. See Roe v. New York, 49 F.R.D. 279 (S.D.N.Y. 1970). Another court suggested that, while the procedure should be used to shield a plaintiff from the stigma that would result if her abortion became public knowledge, it should not be used to protect her doctor from the economic injury that would result if he were known to perform abortions. Doe v. Deschamps, 64 F.R.D. 652 (D. Mont. 1974) (per curiam). The SMU rule would support such an incongruous result. See 599 F.2d at 713.

[FN16]. See supra note 2.

[FN17]. See FED. R. CIV. P. 30-31.

[FN18]. It is likely that if the parties have been unable to settle the dispute, they are no longer interested in amicable relationships. For example, assume that A fails to deliver goods to B under contract, B is damaged, and A refuses to provide a satisfactory settlement. B knows that if he sues A for breach of contract, A and B may never do business again, but B may believe that A's failure to deliver implies that A is unreliable, and that A's

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

failure to make a good settlement implies that A is irresponsible; thus B may never want to do business with A again. Furthermore, A knows that when he needs goods again, he can go to a different supplier. Alternatively, A and B may have had no pretrial relationship and may be similarly uninterested in having a post- trial relationship. For example, when A sues B, and B is the insurer of a tortfeasor who injured A, usually no pretrial or post-trial relationship will exist.

[FN19]. 653 F.2d 180 (5th Cir. 1981).

[FN20]. 599 F.2d at 708-09 (alleging discrimination in violation of Title VII, 42 U.S.C. § § 2000e to 2000e-17 (1976)).

[FN21]. The effectiveness of any judicial relief may depend on an amicable post-trial relationship between the parties, but the defendant may retaliate by refusing to have this relationship.

[FN22]. See, e.g., 29 U.S.C. § 215(a)(3) (1976).

[FN23]. Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980), addressed the closure of a criminal trial. The Court left open the question of the public's right to attend civil trials but noted that 'historically both civil and criminal trials have been presumptively open.' Id. at 580 n.17. The right of the press to report on trials, see Nebraska Press Ass'n v. Stuart, 427 U.S. 539 (1976), and the right of the public to inspect judicial records, see Nixon v. Warner Communications, Inc., 435 U.S. 589, 598-99 (1978), naturally enable the general public to determine the identity of the plaintiff in a lawsuit. See also Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 492 (1975) (recognizing the public's legitimate interest in knowing all the facts the events surrounding a court proceeding).

[FN24]. 49 F.R.D. 279 (S.D.N.Y. 1970).

[FN25]. 364 F. Supp. 536 (S.D.N.Y. 1973) (denying motion to dismiss), 403 F. Supp. 931 (S.D.N.Y. 1975), rev'd sub nom. Whalen v. Roe, 429 U.S. 589 (1977).

[FN26]. 467 F. Supp. 1339 (D. Md. 1979).

[FN27]. Id. at 1348-49.

[FN28]. See, e.g., Roe v. Wade, 410 U.S. 113 (1973) (challenging a criminal abortion statute); Poe v. Ullman, 367 U.S. 497 (1961) (challenging criminal statutes proscribing prescription or use of contraceptive devices); Doe v. McConn, 489 F. Supp. 76 (S.D. Tex. 1980) (challenging city ordinance prohibiting transvestites from appearing in public in dress of other sex); Doe v. Commonwealth's Attorney, 403 F. Supp. 1199 (E.D. Va. 1975) (challenging criminal sodomy statute). But cf. Lindsey v. Dayton-Hudson Corp., 592 F.2d 1118 (10th Cir. 1979) (denying Doe status to civil plaintiff when there had been no anonymity in prior criminal action).

[FN29]. The courts can enjoin or recompense specific retaliatory acts, but preventing community-wide disdain is far more difficult. When the source of the perceived threat to the plaintiff is the defendant, the court has the express authority under FED. R. CIV. P. 26(c) to exercise protective measures. See supra note 3. When the threat stems from nonparty reactions, however, the court has little effective control.

[FN30]. See supra note 2. Professor Wright has said that the discovery rules, FED. R. CIV. P. 26-37, rest 'on a basic philosophy that . . . every party to a civil action is entitled to the disclosure of all relevant information,' a philosophy that rejects the 'sporting theory of justice.' C. WRIGHT, LAW OF THE FEDERAL COURTS § 81, at 398 (3d ed. 1976). 'Victory is intended to go to the party entitled to it . . . rather than to the side that best uses its wits.' Id.

[FN31]. FED. R. CIV. P. 8(c).

[FN32]. FED. R. CIV. P. 13(a).

[FN33]. See, e.g., SMU, 599 F.2d at 713; National Org. for Women v. Sperry Rand Corp., 88 F.R.D. 272, 275 (D. Conn. 1980). See infra note 75.

[FN34]. The desire for a nonviolent means of settling disputes was the fountainhead of the judicial system. The Roman and German predecessors of the common law arose as nonviolent methods of ending blood feuds; 'the compensation received in the appeal was the alternative of vengeance.' O. W. HOLMES, THE COMMON LAW 2-3 (1881). Holmes would argue, in the criminal context, that

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

even if there were rule of the strong, such rule would be accomplished best through a judicial sytem. '[T]he first requirement of a sound body of law is, that it shall correspond with the actual feelings and demands of the community, whether right or wrong. If people would gratify the passion of revenge outside of the law, if the law did not help them, the law has no choice but to satisfy the craving itself, and thus avoid the greater evil of private retribution.' Id. at 41-42 (emphasis added). Thus, one benefit of a judicial system is its ability to appease the craving for revenge, yet impose punishment after passions have cooled. Holmes' point is that even in the worst case judicial retribution is better than nonjudicial retribution. But see Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 571 (1980) (recognizing that public disclosure promotes societal deference to judicial resolution of disputes):

[T]he open processes of justice serve an important prophylactic purpose, providing an outlet for community concern, hostility, and emotion. Without an awareness that society's responses to criminal conduct are underway, natural human reactions of outrage and protest are frustrated and may manifest themselves in some form of vengeful 'self-help,' as indeed they did regularly in the activities of vigilante 'committees' on our frontiers.

[FN35]. 'Sunshine laws,' which open governmental decisionmaking to public scrutiny, were recently enacted on a similar theory--that requiring government officials to labor in the public eye makes them accountable and thus more responsible, reducing abuse of power and illegal acts. Markham, Sunshine on the Administrative Process: Wherein Lies the Shade?, 28 AD. L. REV. 463, 465 (1976); Wickham, Let the Sunshine In! Open-Meeting Legislation Can Be Our Key to Closed Doors in State and Local Government, 68 NW. U.L. REV. 480, 489 (1973).

[FN36]. SMU, 653 F.2d 180, 189 (5th Cir. 1981) (Gee, J., dissenting).

[FN37]. It may appear that the logical context in which to consider standing would be that of the defendant's interests since the defendant may be subject to a wrongful suit if he cannot challenge standing. The doctrine, however, is an aspect of constitutional constraint on federal jurisdiction, and thus it involves interests far broader than those of

the defendant. See L. TRIBE, AMERICAN CONSTITUTIONAL LAW 79-82 (1978). Cf. FED. R. CIV. P. 12(h)(3): 'Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.' (emphasis added); Knee v. Chemical Leaman Tank Lines, Inc., 293 F. Supp. 1094 (E.D. Pa. 1968) (the parties may not waive lack of subject matter jurisdiction).

[FN38]. U.S. CONST. art. III, § 2.

[FN39]. See, e.g., United Pub. Workers of Am. v. Mitchell, 330 U.S. 75, 89-90 (1947) and cases cited therein. See also Poe v. Ullman, 367 U.S. 497 (1961) (dismissing the appeal on the grounds that no actual injury had been asserted). For a general discussion of the case or controversy and standing requirements, see C. WRIGHT, supra note 30, at §§ 12-14. See generally C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 3531 (1975) (describing the standing requirement in detail).

[FN40]. See Linda R.S. v. Richard D., 410 U.S. 614, 617 (1973); Baker v. Carr, 369 U.S. 186, 204-08 (1962); Chicago & Grand Trunk Ry. Co. v. Wellman, 143 U.S. 339, 345 (1892); Marbury v. Madison, 5 U.S. (1 Cranch) 137, 163 (1803) ('The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.'). See also Flast v. Cohen, 392 U.S. 83, 94-101 (1968) (discussing the concept of justiciability as including the 'injury in fact' requirement). For a detailed discussion of justiciability, see Baker v. Carr, 369 U.S. 186, 208-237 (1962).

Professor Tribe argues that the doctrine of injury in fact embodies policy considerations broader than those found in the case or controversy doctrine. See L. TRIBE, supra note 37, at 80-97.

[FN41]. See supra note 37.

[FN42]. Baker v. Carr, 369 U.S. 186, 204 (1962).

[FN43]. See Jaffe, The Citizen as Litigant in Public Actions: The Non- Hohfeldian or Idological Plaintiff, 116 U. PA. L. REV. 1033, 1038-39 (1968) (stating the argument, but minimizing it).

[FN44]. L. TRIBE, supra note 37, at 53, 82. See

Case 1:00-cv-00182 Document 8 Filed in TXSD on 01/29/2001 Page 28 of 31

also Flast v. Cohen, 392 U.S. 83, 95-96 (1968) (discussing the federal doctrine against giving advisory opinions in terms of implicit justiciability, separation of powers, and federalism policy considerations).

[FN45]. E.g., SMU, 599 F.2d 707; Doe v. Deschamps, 64 F.R.D. 652 (D. Mont. 1974) (per curiam). See also Doe v. Rokster, 89 F.R.D. 158 (N.D. Cal. 1981) (social stigma or the threat of physical harm).

[FN46]. E.g., Roe v. Ingraham, 364 F. Supp. 536 (S.D.N.Y. 1973) (denying motion to dismiss), 403 F. Supp. 931 (S.D.N.Y. 1975), rev'd sub nom. Whalen v. Roe, 429 U.S. 589 (1977).

[FN47]. Doe v. Stegall, 653 F.2d 180 (5th Cir. 1981).

[FN48]. Some commentators characterize the constitutional right of privacy as a mixed bag of limitations on intrusion into one's personhood. See, e.g., Comment, A Taxonomy of Privacy, 64 CAL. L. REV. 1447 (1976) (suggesting that individuals have privacy rights in repose at home, cohabitation decisions, child-rearing decisions, bodily-integrity decisions, in-home possessions, sexual activities of consenting adults, and freedom from viewers outside of the home, government discovery of information, discovery of private facts by private parties, and captive audiences). Professors Freund and Tribe, however, argue for a broader, more unified characterization of the right of privacy. See L. TRIBE, supra note 37, at 889 (citing Freund, 52d ALI Ann. Mtg. 42-43 (1975) ('those attributes of an individual which are irreducible in his selfhood')). Tribe argues that privacy should be both 'inward and outward looking,' encompassing not only intrusions into personhood, but also encompassing the right to control the information on reveals about himself. Tribe's right of privacy and personhood would give an individual the power to control his identity by giving him control over the impression he makes on others. Id. at 888-89. Thus, in his analysis of the Doe-plaintiff case, Whalen v. Roe, 429 U.S. 589 (1976), Tribe points out that the majority of the Court did not make the artificial distinction between a person's desire 'not to be known as a user of drug X and that person's desire to be known as someone who does not use the drug.' L. TRIBE, supra note 37, at 888 (emphasis in

original). This broader characterization of privacy, if adopted by the courts, would be consistent with this Note's position that to prevent dilution of relief, certain plaintiffs must control the dissemination of certain information about themselves.

[FN49]. See, e.g., SMU, 599 F.2d 707.

[FN50]. See Doe v. Deschamps, 64 F.R.D. 652 (D. Mont. 1974) (per curiam).

[FN51]. 364 F. Supp. 536 (S.D.N.Y. 1973) (denying motion to dismiss), 403 F. Supp. 931 (S.D.N.Y. 1975), rev'd sub nom. Whalen v. Roe, 429 U.S. 589 (1977).

[FN52]. Roe v. Ingraham, 364 F. Supp. 536, 541 n.7 (S.D.N.Y. 1973).

[FN53]. United States v. Doe, 655 F.2d 920, 930 n.1 (9th Cir. 1981) (Sneed, J., dissenting) (where a defendant challenging his criminal conviction faced a serious risk of bodily harm for his cooperation as a government witness).

[FN54]. 410 U.S. 179 (1973).

[FN55]. 653 F.2d 180, 181 (5th Cir. 1981).

[FN56]. 'We advance no hard and fast formula for ascertaining whether a party may sue anonymously. The decision requires a balancing of considerations calling for maintenance of a party's privacy against the customary and constitutionally-embedded presumption of openness in judicial proceedings.' Id. at 186.

[FN57]. Powers, Formalism and Nonformalism in Choice of Law Methodology, 52 WASH. L. REV. 27, 28-30 (1976). A formal doctrine has advantages, but those advantages are not particularly relevant in this context. Two characteristics of a formal doctrine are an increase in the predictability of decisionmaking, and a shifting of discretionary power from the decisionmaker (the trial judge) to the rulemaker (the appellate judge). Id. at 29. Predictability is advantageous when the goal of the law is to affect behavior outside of the courtroom. Since criminal behavior is costly to society, there is a strong incentive to make sure that punishment takes place. Criminal statutes are specific in their explication of the elements of the crime, both to

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00182   Document 8   Filed in TXSD on 01/29/2001   Page 29 of 31

make clear to individuals what behavior is prohibited and to make clear to judges that such behavior must be punished. Ehrlich & Posner, An Economic Analysis of Legal Rulemaking, 3 J. LEGAL STUD. 257, 262 (1974). Similarly, since taxpayers depend on formalized tax rules to predict their future tax laibility and to know how much money to allocate for it, the tax laws are clearly laid out in formal rules. The Doe-plaintiff doctrine, however, is a refinement of courtroom procedure that will have no effect in advance of litigation; therefore, it cannot benefit from the greater predictability of a formal rule.

[FN58]. Powers, supra note 57, at 28.

[FN59]. 42 U.S.C. § 1975(a) (1976). For a discussion of the legislative history of the Act see Hannah v. Larche, 363 U.S. 420, 430-39 (1960).

[FN60]. 42 U.S.C. § 1975c(a)(1) (1976).

[FN61]. 1959 U.S. COMMISSION ON CIV. RTS. REP. 55.

[FN62]. 1961 U.S. COMMISSION ON CIV. RTS. REP., pt. 1, at 39.

[FN63]. See, e.g., 1959 U.S. COMMISSION ON CIV. RTS. REP. 55-67, 90-97.

[FN64]. Id. at 69.

[FN65]. See Larche v. Hannah, 176 F. Supp. 791 (W.D. La. 1959) (granting a temporary injunction staying the commission's subpoenas), motion for summary judgment denied, 177 F. Supp. 816 (W.D. La. 1959) (three judge court), rev'd, 363 U.S. 420 (1960).

[FN66]. Larche v. Hannah, 177 F. Supp. 816, 822 (W.D. La. 1959), rev'd, 363 U.S. 420 (1960).

[FN67]. 1959 U.S. COMMISSION ON CIV. RTS. REP. 99.

[FN68]. Hannah v. Larche, 363 U.S. 420, 451 (1960).

[FN69]. In a concurring opinion, Justice Frankfurter recognized the compelling need for anonymity under these circumstances, but noted his hesitation to extend the procedure to adjudicatory contexts. Id. at 486 (Frankfurter, J., concurring).

[FN70]. Although the Commission kept the complaints confidential, most of its hearing was public. In Alabama, for example, thirty-three witnesses were willing to testify publicly. Report of the U.S. Comm'n on Civil Rights 80 (1959). The Commission Report did document one case of retaliation against a black who had testified in Louisiana. 1 Report of the U.S. Comm'n on Civil Rights 96 (1961), citing United States v. Deal, No. 8132, (W.D. La. Jan. 1961).

[FN71]. 653 F.2d 180, 182 & n.6, 184-86 (5th Cir. 1981).

[FN72]. 85 F.R.D. 1, 2 & n.1 (E.D. Mich. 1977). See also United States v. Doe, 655 F.2d 920, 922 n.1 (9th Cir. 1981) (holding that where a defendant challenging his criminal conviction faced a serious risk of bodily harm for his cooperation as a government witness, the defendant should be allowed to proceed anonymously).

[FN73]. 599 F.2d at 713. The SMU 'test characteristics' center around the privacy right. See supra notes 48-50 and accompanying text. The SMU court noted that '[plaintiffs] face no greater threat of retaliation than the typical plaintiff alleging Title VII violations, including other women who, under their real names . . . have filed sex discrimination suits . . . .' 599 F.2d at 713. It is not clear, therefore, whether the court would have reached the same conclusion had the possible retaliation been a threat of physicial violence.

[FN74]. See Southern Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe, No. CA3-76-0638 (N.D. Tex. Nov. 19, 1979) (order granting motion by Lawyers A and B to withdraw). The SMU Association of Women Law Students prosecuted the suit to final judgment, however. 599 F.2d 707 (5th Cir. 1979). Had the association not been available to act as plaintiff, Lawyers A and B might have been more reluctant to drop the suit.

[FN75]. For example, in Gomez v. Buckeye Sugars, 60 F.R.D. 106 (N.D. Ohio 1973), the plaintiffs alleged that their employer had not complied with the Fair Labor Standards Act. The court allowed an anonymous suit even though the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00182   Document 8   Filed in TXSD on 01/29/2001   Page 30 of 31

plaintiffs were not sure whether Buckeye Sugars was one of their employers. Moreover, the fictitious name chosen was a Spanish surname. Thus, Buckeye Sugars suffered an accusation of racial discrimination before anyone knew whether the plaintiffs' case had any merit. See supra text accompanying note 33.

[FN76]. See supra note 34.

[FN77]. 357 U.S. 449 (1958).

[FN7HE. Id. at 453-54. The Alabama Supreme Court refused to review the contempt citation, once for insufficiency of allegations, Alabama ex rel. Patterson v. NAACP, 265 Ala. 356, 91 So. 2d 221 (1956) (per curiam), and again on procedural grounds. 265 Ala. 349, 91 So. 2d 274 (1956) (per curiam), cert. granted, 353 U.S. 972 (1957). The Supreme Court reversed the contempt judgment. 357 U.S. 449, 460-66 (1958). On remand, the Alabama Supreme Court reaffirmed its original judgment. 268 Ala. 531, 109 So. 2d 138 (1959) (per curiam). The Supreme Court again reversed. 360 U.S. 240, 243 (1959) (per curiam). The NAACP brought an action in federal district court in an attempt to reach the federal question merits; that court dismissed the action but was reversed on appeal to the Fifth Circuit. NAACP v. Gallion, 190 F. Supp. 583, 586 (M.D. Ala.) (issues should be tried in state courts first), rev'd, 290 F.2d 337 (5th Cir. 1960), aff'd, 368 U.S. 16 (1961) (per curiam) (ordering continuing federal jurisdiction and trial over the federal issues, as appropriate and in the discretion of the federal district court). The state circuit court finally heard the case on its merits, found against the NAACP, and was affirmed by the state supreme court. NAACP v. State, 274 Ala. 544, 150 So. 2d 677 (1963), rev'd remanded sub nom. NAACP v. Alabama ex rel. Flowers, 377 U.S. 288 (1964).

[FN79]. 357 U.S. at 462.

[FN80]. Id. at 462-63.

[FN81]. It must be noted that the association was a defendant in this action. The Court's constitutional reasoning turned, however, on the argument that '[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association . . ..' Id.

at 460 (emphasis added). Consequently, had the association been the plaintiff, the first amendment would have compelled the same result. NAACP v. Button, 371 U.S. 415, 428 (1962) ('We also think petitioner has standing to assert the corresponding rights of its members.'). Contra National Org. for Women v. Sperry Rand Corp., 88 F.R.D. 272 (D. Conn. 1980) (finding that bringing suit constitutes a partial waiver of associational rights of privacy).

[FN82]. The distinction between privacy and stigmatization cases, as used here, is subtle. Stigmatization refers to the reaction of the public upon learning of the plaintiff's claim. The plaintiff's privacy interests encompass his desire not to disclose information about himself, regardless of public reaction. Little practical difference separates the two, as most courts consider them together.

[FN83]. See supra note 28 and accompanying text.

[FN84]. See, e.g., Doe v. Stegall, 653 F.2d 180 (5th Cir. 1981); Doe v. Lally, 467 F. Supp. 1339 (D. Md. 1979).

[FN85]. See supra notes 24-28 and accompanying text.

[FN86]. SMU, 599 F.2d 707.

[FN87]. See, e.g., Roe v. Wade, 410 U.S. 113 (1973) (challenging state abortion statute); Doe v. Civiletti, 635 F.2d 88 (2d Cir. 1980) (challenging the administration of a federal witness protection program); Doe v. Rostker, 89 F.R.D. 158 (N.D. Cal. 1981) (challenging draft registration); Roe v. Ingraham, 364 F. Supp. 536 (S.D.N.Y. 1973) (denying motion to dismiss), 403 F. Supp. 931 (S.D.N.Y. 1975), rev'd sub nom. Whalen v. Roe, 429 U.S. 589 (1977) (challenging state controlled substances act); Doe v. Boyle, 60 F.R.D. 507 (E.D. Va. 1973), aff'd, 494 F.2d 1279 (4th Cir. 1974) (challenging statutory compulsion to file overdue tax returns); Doe v. Shapiro, 302 F. Supp. 761 (D. Conn. 1969) (challenging State Welfare regulations), appeal dismissed on procedural grounds, 396 U.S. 488 (1970).

[FN88]. See Buxton v. Ullman, 147 Conn. 48, 59, 156 A.2d 508, 514 (1959) (noting that no real plaintiff existed where future injury was too speculative), appeal dismissed sub nom. Poe v.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Ullman, 367 U.S. 497 (1961) (dismissing on nonjusticiability issue, not absence of a 'real' plaintiff). The Supreme Court's language in Roe v. Wade, 410 U.S. 113 (1973), suggests that the issue of a nonexistent plaintiff may require explicit challenge by the defense. See supra note 9. See also Doe v. Boyle, 60 F.R.D. 507, 508 (E.D. Va. 1973) (fifth amendment protects people, not aliases).

[FN89]. Roe v. Ingraham, 364 F. Supp. 536, 541 n.7 (S.D.N.Y. 1973) (denying a motion to dismiss), 403 F. Supp. 931 (S.D.N.Y. 1975), rev'd on other grounds sub nom. Whalen v. Roe, 429 U.S. 589 (1977). See also Doe v. Mundy, 514 F.2d 1179, 1182 (7th Cir. 1975) (class plaintiff certified on the basis of her affidavits only). Cf. Silva v. Bell, 605 F.2d 978 (7th Cir. 1979) (since there was no challenge to the standing of plaintiff class members residing in the United States, the constitutional case or controversy requirement of the standing doctrine was satisfied as to nonresident class members as well).

[FN90]. Buxton v. Ullman, 147 Conn. 48, 60, 156 A.2d 508, 514 (1959), appeal dismissed sub nom. Poe v. Ullman, 367 U.S. 497 (1961).

[FN91]. See Doe v. General Hosp., 434 F.2d 427, 429 n.2 (D.C. Cir. 1970). See also Gomez v. Buckeye Sugars, 60 F.R.D. 106 (N.D. Ohio 1973) (affidavits taken in camera).

[FN92]. See, e.g., Doe v. Mundy, 514 F.2d 1179 (7th Cir. 1975); Doe v. General Hosp., 434 F.2d 427, 429 n.2 (D.C. Cir. 1970).

[FN93]. See, e.g., Doe v. Boyle, 60 F.R.D. 507 (E.D. Va. 1973), aff'd, 494 F.2d 1279 (1974); Roe v. Ingraham, 364 F. Supp. 536, 541 n.7 (S.D.N.Y. 1973) (denying motion to dismiss), 403 F. Supp. 931 (S.D.N.Y. 1975), rev'd sub nom. Whalen v. Roe, 429 U.S. 589 (1977).

[FN94]. See, e.g., Roe v. Ingraham, 364 F. Supp. 536, 541 n.7 (S.D.N.Y. 1973) (denying motion to dismiss), 403 F. Supp. 931 (S.D.N.Y. 1975), rev'd sub nom. Whalen v. Roe, 429 U.S. 589 (1977) (noting possible discovery problems).

[FN95]. See, e.g., Doe v. Mundy, 514 F.2d 1179, 1182 (7th Cir. 1975) (finding that plaintiff's anonymity did not weaken the defendant's ability to present his case since the case was not fact intensive).

[FN96]. See Gomez v. Buckeye Sugars, 60 F.R.D. 106 (N.D. Ohio 1973).

[FN97]. See, e.g., id.

[FN98]. See, e.g., SMU, 599 F.2d at 714 (ordering plaintiffs' names revealed to two members of the firm and binding those attorneys not to disclose the names to other members of the firm); National Org. for Women v. Sperry Rand Corp., 88 F.R.D. 272, 275 (D. Conn. 1980).

[FN99]. See, e.g., Doe v. Stegall, 653 F.2d 180, 182 & n.5 (5th Cir. 1981).

[FN100]. In Cox Broadcasting Corp. v. Cohn, 420 U.S. 469 (1975), the plaintiff claimed that the press invaded his privacy by publishing the name of his daughter who had been raped and killed. The Court held:

At the very least, the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records. If there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information.

Id. at 496.


END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works